IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MELYNDA MICHELLE FISHER, | § § | |
| Plaintiff, | § § | |
| v. | § § | 1:18-CV-1108-RP |
| SETON FAMILY OF HOSPITALS, | § § | |
| Defendant. | § § | |

**ORDER**

On June 14, 2021, the Court held a bench trial in this matter. (Dkts., 66, 67). The parties submitted their closing briefs on July 22, 2021. (Def.'s Closing Br., Dkt. 71; Pl.'s Closing Br., Dkt. 72). Having considered the evidence and testimony presented at trial, the arguments of counsel, the briefing, and the governing law, the Court enters the following findings of fact and conclusions of law.

**I. Background**

Plaintiff Michelle Melynda Fisher ("Fisher") was employed by Seton Family Hospitals ("Seton") as a medical assistant from July 18, 2016 until November 15, 2017. Between July 2017 and November 2017, Fisher took leave under the Family Medical Leave Act ("FMLA") to care for her mother who suffers from Alzheimer's Disease. To properly report her FMLA leave, Fisher was required to (1) report FMLA related absences to Seton's third-party leave administrator, Sedgwick Claims Management Services, Inc. ("Sedgwick"), on the same or next business day; (2) submit edits to her timecard for FMLA leave; and (3) approve her timecard for each pay period. After Fisher improperly reported her FMLA leave, her supervisor, Kendall Sharp ("Sharp") provided Fisher with coaching on how to properly report her FMLA leave and warned her that further improper reporting could lead to termination.

1

This dispute centers around certain of Fisher's absences between October 25, 2017 and November 7, 2017 while Fisher experienced ongoing personal illnesses in addition to taking protected leave to care for her mother. First, on October 25, Fisher missed work due to a migraine, and reported this absence as FMLA-related on October 26. (Oct. 25. Text Message, Dkt. 27-6, at 51; Oct. 26 Notice of Absence Report, Dkt. 27-10, at 27). Second, Fisher missed work on November 3, 6, and 7 due to a severe toothache that led to oral surgery. (Nov. 3–Nov. 8 Text Messages, Dkt. 27-6, at 56–61; Fisher Dep., Dkt. 29-1, at 10). Fisher brought her mother to her dentist appointments on November 6 and 7. (Fisher Dep., Dkt. 29-1, at 13).

Fisher texted Sharp about each of these absences and indicated when she was dealing with her own medical issues, though did not indicate whether she was caring for her mother on these days. (*See* Text Messages, Dkt. 27-6, at 22–71). On November 8, 2017, Fisher texted Sharp stating "I didn't file for fmla days off since this is about me," yet the parties dispute whether this text message referred to November 6 and 7, when Fisher was at the dentist, or to November 8 through 12, when Fisher used paid time off to recover from oral surgery. (Nov. 8 Text Message, Dkt. 27-6, at 64; *compare* Dkt. 27, at 13; *with* Dkt. 31, at 2). While Fisher could properly use her FMLA leave when she was tending to her own personal health issues while caring for her mother, Sharp believed that when Fisher missed work to care for her own medical issues, she could not report those absences as FMLA-related. (Dkt. 27-4, at 28).

As such, when Sharp received a "Notice of Absence Report" showing that Sedgwick had approved of Fisher's absences on October 25 and November 3, 6, and 7 as FMLA-related, she believed Fisher had improperly reported absences related to her own health issues as being FMLA-related. (Approval Notices, Dkt. 27-2, at 66, 107, 109, 112). Sharp then contacted Human Resources Advisor Elena Rojo ("Rojo") to request Fisher's termination. (Sharp Dep., Dkt. 27-4, at 44; Nov. 14 Email, Dkt. 27-9, at 50). On November 14, 2017, Rojo approved Sharp's request to terminate

2

Fisher's employment for providing false information to Sedgwick. (Rojo Dep., Dkt. 27-9, at 30–31, 36; Dkt. 27-9, at 48). The next day, Sharp terminated Fisher's employment. (Termination of Employment Report, Dkt. 27-3, at 3–4). Seton articulated three bases for Fisher's termination: (1) "providing false or misleading information or omitting material information in connection FML" on October 25, November 3, 6 and 7; (2) "unscheduled and unexcused absences" between October 30 and November 1 and 2, 2017; and (3) "excessive unscheduled PTO" on November 19, October 25, and November 3 through 7, 2017. (*Id.* at 3).

By way of this lawsuit, Fisher claimed that she was unlawfully terminated by Seton in violation of the Americans With Disabilities Act ("ADA"), Texas Commission on Human Rights Act ("TCHRA"), and FMLA. (Am. Compl., Dkt. 5, at 2–3). After resolving the parties' cross motions for summary judgment, only Fisher's FMLA retaliation claim remained for trial. (Order, Dkt. 50). With regard to Fisher's FMLA retaliation claim, the Court found that while Fisher had established a *prima facie* case of retaliation, a fact issue remained as to whether Seton's decision makers held a good faith belief that she had falsified her FMLA reporting. (*Id.* at 8–10). The trial focused on a single straightforward issue of fact: at the time of Fisher's termination, did Seton's decision makers hold a good faith belief that Fisher had falsified her FMLA reporting?

## II. Summary of the Evidence

At trial, the Court heard testimony from four witnesses: Melynda Michelle Fisher, Kendall Sharp, Elena Rojo, and William Cook.

### A. Melynda Michelle Fisher

With regard to the dates in question, Fisher testified that on October 25 and November 3, 6, and 7, she was caring for her mother while tending to her own medical issues and because she had been instructed to only inform Sharp of absences due to her own medical issues, she alerted Sharp to her illness and separately reported her use of FMLA leave to Sedgwick. At first, Fisher testified

3

that she had a call with Sharp sometime between November 6 and November 13 regarding her use of FMLA leave while tending to her own medical issues, though Fisher does not have any records of this call and does not recall when it occurred. Later, Fisher testified that this phone call happened on November 8, though she could not recall how long the call was or who had initiated it. Fisher further testified that during this phone call she told Sharp that her mother had been with her at the dentist on November 6 and 8. Fisher further testified that during the call she noticed that Sharp's tone with her was different, and as such followed up the call with a text stating "Is everything ok?." Fisher testified that on this day, she was also taking pain medication because of the oral surgery she had undergone the previous day.

Fisher also testified that she spoke with a representative of Sedgwick on November 13, who informed her that she had properly reported November 3, 6, and 7 as FMLA-related absences because if "I'm taking care of my mother, nothing else matters after that." (Day 1 Tr., at 191). Fisher testified that she told Sharp about her conversation with the Sedgwick representative, though she does not recall the date of this conversation. At her termination meeting, Fisher testified that she signed her termination notice but does not remember receiving any other paperwork. Fisher confirmed that she never used Seton's problem resolution policy with respect to her termination, and did not complain to anyone about her termination.

### B. Kendall Sharp

Kendall Sharp was Fisher's manager for the four months preceding Fisher's termination. (Day 1 Tr., at 76). Sharp first learned about Fisher's use of FMLA when she started managing Fisher. Her understanding was that Fisher's mother required constant supervision due to her Alzheimer's and progressive dementia. When certain colleagues made negative comments about Fisher's use of FMLA leave, Sharp set up a meeting with all medical assistants to alert them that FMLA leave is "protected" and "it will not be tolerated that people will be talking about someone

4

who's out on FMLA." (Day 1 Tr., at 123). Sharp testified that she wanted Fisher to return to her medical assistant position once she found consistent care for her mother.

When Sharp noticed in August 2017 that Fisher had trouble properly reporting her use of FMLA leave, Sharp offered Fisher performance coaching to make sure she understood how to properly report her absences. Sharp testified that, even after coaching, Fisher struggled to properly edit her time entries. On October 16, Sharp testified that she again reviewed Seton's time reporting policies with Fisher but did not discipline Fisher for her continued reporting errors because she was "trying to give her the opportunity to change her behavior." (*Id.* at 142).

Though Fisher originally had to notify her manager and Sedgwick every day that she used her FMLA leave, Sharp modified this policy halfway through her time supervising Fisher so that Fisher only needed to contact Sharp if she could work or to report her use of unscheduled paid time off, but not to inform Sharp of her use of FMLA-leave. As such, at the time of her termination Fisher was required to notify Sedgwick and submit a time edit request to use her FMLA leave. Sharp testified that "typically" Fisher alerted Sharp when she used time off for her own medical issues. (*Id.* at 84). For example, on September 19, 2017, Fisher took an unscheduled day off due to dizzy spells and vomiting and told Sharp the next day that she had used unscheduled paid time off for that day since she was tending to her own medical issue. Based on this interaction, Sharp believed that Fisher understood that she had to report days she took off due to her own medical issues to Sharp.

Thus, when Fisher texted Sharp about her own medial issues on October 25, November 3, 6, and 7, Sharp believed that Fisher was reporting unscheduled paid time off to Sharp. For example, when Fisher texted Sharp on November 3 that she had a fever and toothache, Sharp assumed that Fisher was taking an unscheduled absence and did "not expect that she would report it as FMLA . . . because she informed me by text that it was for her illness." (*Id.* at 147). Similarly, when Fisher texted Sharp on November 5 regarding her worsening toothache and need to visit a dentist, Sharp's

5

"assumption [was] that [on November 6] she was taking care of herself for a severe toothache that she described to me." (*Id.* at 148). Sharp did not expect Fisher to report November 6 as an FMLA-covered absence because "she was taking care of her own severe pain and", as such, "this [absence] was [for an] unscheduled medical illness for herself." (*Id.* at 150). Sharp testified that on November 7, she believed that Fisher "was going to have to go for a root canal for herself and would be occupied by that procedure." (*Id.* at 151). Sharp further testified that she "would have not envisioned that [it] would be possible [for Fisher to] supervise her [mother during a root canal]." (*Id.* at 152).

As such, when Fisher texted Sharp on November 7 telling her that she did not file for FMLA leave because she was tending to her own medical issues, Sharp believed Fisher had been referring to November 6 and 7, and not the upcoming days Fisher took off using paid time off to recover from the surgery. Sharp denies having spoken with Fisher on the phone about her absences related to Fisher's dental issues. Sharp testified that Fisher never mentioned caring for her mother on these days, and Sharp did not ask Fisher if she was taking care of her mother on October 25, November 3, 6 or 7. Sharp was not aware of whether it was possible for employees to tend to their own medical issues while caring for a family member covered by the FMLA, but testified that it was "possible that it [was] permitted." (Day 1 Tr., at 97–98).

After Sharp received notice that Fisher had reported November 3, 6, and 7 as FMLA-covered absences, Sharp began collecting information on Fisher's reporting because "[s]omething just wasn't adding up." (*Id.* at 157). Sharp testified that when she alerted Fisher about her concerns regarding her FMLA reporting on days when she understood Fisher to be taking unscheduled time off, Sharp did not ask and Fisher did not say whether she was caring for her mother on those days. Sharp testified that she told Fisher in person on November 13 and via text about her concerns regarding Fisher's FMLA reporting. During the in-person conversation on November 13, Sharp

6

testified that she informed Fisher that she was concerned about Fisher's processes for reporting her FMLA and unscheduled absences, invited her to share information with Sharp, and alerted Fisher that she was contacting human resources to "gather more data on how to handle this." (Day 2 Tr., at 34–35) ("I shared with her my concern of her submitting time for FMLA when she was having her own personal illness, that she reported to me as unscheduled PTO."). Sharp testified that Fisher did not offer any information about caring for her mother on the days in question during this conversation. Sharp did not directly ask Fisher during this conversation whether she had been caring for her mother on the days in question because "it was clear to me that she was communicating to me why it was that she was taking her time off" on the days at issue based on the text messages Fisher and Sharp exchanged. (*Id.* at 36–37).

Sharp was the primary decisionmaker with regard to Fisher's termination. After gathering information and preparing a chart of Fisher's absences and reporting, Sharp recommended Fisher's termination because "there were multiple processes that were not being followed properly, even with what I believed to be a very significant amount of coaching." (Day 2 Tr., at 158). Sharp testified that it was "clear to [her]," based on the text messages, that on the days in question Fisher had been tending to her own medical issues rather than caring for her mother. (*Id.* at 109). Sharp testified that during her termination meeting with Fisher, the two reviewed the termination letter "word for word" and Sharp provided Fisher with the problem resolution policy Fisher could utilize to challenge her termination. (*Id.* at 159–60). Sharp testified that Fisher never indicated during the meeting that Sharp was mistaken in believing that Fisher had falsely reported her time.

### C.  Elena Rojo

Elena Rojo worked work in human resources at Seton at the time Fisher was terminated. As a member of human resources, Rojo attended about two or three training sessions on equal opportunity, which included training on the FMLA. Rojo testified that Sharp consulted with her

regarding the decision to terminate Fisher's employment. Sharp told Rojo about issues with Fisher's "erratic" attendance in a call, and also texted Rojo about Fisher having reported her absences as covered by the FMLA when in fact she was absent from work to care for her own medical issues. (Day 1 Tr., at 25–26). Rojo thus began an investigation into whether Fisher had falsified her FMLA reporting. By this time, Rojo believed that Sharp had been having ongoing conversations with Fisher regarding her FMLA reporting. Rojo testified that at the time of Fisher's termination, she sincerely believed that Fisher had falsified her FMLA reports on days she was absent for her own medical issues.

Rojo approved of Fisher's termination based on her fraudulent use of FMLA leave after reviewing the documentation provided by Sharp, including text messages, emails, and Fisher's reports to Sedgwick, and after reviewing those documents with Seton's legal team. Rojo said that the basis for her conclusion that Fisher had improperly used her FMLA leave was the reference to Fisher's own medical issues in the text messages between Fisher and Sharp. Rojo further testified that it would have been possible for Fisher to have been terminated for her excessive absences alone, regardless of the alleged falsification of FMLA leave. Rojo testified that Seton has a problem resolution policy whereby employees could challenge a termination they believe was wrongful, which Fisher did not utilize.

Rojo also confirmed that if Fisher had been taking care of her mother while tending to her own medical conditions, that would be a valid use of FMLA leave. (*Id.* at 47–48, 53–54). Rojo testified that she does not recall ever asking Sharp whether Fisher had been caring for her mother on the days she reported as covered by FMLA leave. (*Id.* at 30). Rojo does not recall Fisher ever having told her that on October 25 or November 3, 6, and 7 she was caring for her mother while also tending to her own medical issues. (*Id.* at 67). Rojo did not speak with Fisher about whether Fisher had been caring for her mother on the days at issue, but rather left that discussion to Sharp. (*Id.* at

8

32–33). Rojo testified that it would not have been her practice to talk to Fisher about submitting her own FMLA request based on her medical issues. (*Id.* at 55–56). Rojo did not have any concerns about how Sharp handled Fisher's termination because Sharp had previously been flexible with Fisher to accommodate her need for leave and Rojo believed the text messages clearly showed that Fisher had improperly reported her FMLA leave.

### D. Williams Cook

Cook works in human resources at Seton as the director of positions practice operations—the same position he held in 2017. Cook has himself used FMLA leave to care for his mother during his time with Seton. Cook became Sharp's supervisor in 2011, and as such, met with her monthly and was available to help her with questions. Cook testified that he supported Sharp's recommendation to terminate Fisher because he understood that Fisher had committed a "couple of policy violations." (Day 2 Tr., at 21). Cook did not approve of Fisher's termination, but rather served as a guide to Sharp in navigating the termination process. Cook typically defers termination decisions to managers and human resources, and did so with regard to Fisher's termination.

Cook recalls Sharp informing him that she believed Fisher had been improperly using her FMLA leave to cover her own personal illnesses. Cook instructed Sharp to gather more information and then proceed with guidance from human resources. Cook testified that he did not instruct Sharp or anyone else at human resources to ask Fisher whether she had been caring for her mother on the days in question. Cook similarly believed from the test messages between Fisher and Sharp that it was clear that Fisher was tending to her own medical issues on the days in question, and understood that those days should have been reported as unscheduled time off from work. At the time of Fisher's termination, Cook thought that Sharp "sincerely believed" that Fisher had misused her FMLA leave. Cook testified that Sharp never expressed hostility towards Fisher's use of FMLA leave.

### III. Discussion

This case turns on whether Seton's decision makers held a good faith belief that Fisher had falsified her FMLA reporting at the time of her termination. In their testimony, Fisher and Sharp dispute whether Fisher ever communicated with Sharp regarding her proper use of FMLA leave on the days in question. Fisher testified that she had a phone conversation with Sharp wherein she told her supervisor that she was caring for her mother during the days in question and that Sedgwick had told Fisher she had properly reported those days as covered by the FMLA. Sharp, on the other hand, denies that this conversation ever happened and instead insists that Sharp initiated a conversation with Fisher regarding her concerns with Fisher's FMLA reporting, during which Fisher never mentioned having cared for her mother on the days in question.

The Court concludes that Fisher's testimony regarding a phone call between herself and Sharp should be given little weight since Fisher was inconsistently able to remember any details of the call and has failed to offer phone records or other evidence supporting the existence of such a conversation. Indeed, when she was able to recall details of when the call allegedly occurred, Fisher stated that it happened between 7:09p.m. and 7:19 p.m. on November 8, 2018, when Fisher and Sharp were texting about her absences. Yet as Seton points out, given the quick succession between these text messages, any call could not have been longer than two minutes. (Def.'s Closing Br., Dkt. 71, at 5–6). In addition, Fisher could not recall who called who or how long the conversation lasted—though she insists she had time to tell Sharp that she had been with her mother all day. The Court further notes that Fisher also testified that she was on pain killers on the day she claims the call happened, calling into question the accuracy of her memories of this day. Moreover, Sharp denies ever having had a phone conversation with Fisher regarding the absences.

In contrast, Sharp testified that Fisher never once told her that she had been caring for her mother on the days in question, even during Fisher's termination meeting. However, regardless of

10

whether such a call occurred, Sharp made multiple attempts to help Fisher learn how to properly report her time, counseled other employees to not negatively comment on Fisher's use of FMLA leave, and testified that she sincerely believed Fisher had fraudulently reported her FMLA at the time she recommended Fisher's termination. In addition, Rojo and Cook both testified that they thought Sharp believed Fisher had engaged in FMLA fraud and themselves believed this to be true at the time of Fisher's termination based on the text messages between Fisher and Sharp. These facts belie the notion that Sharp recommended Fisher's termination due to discriminatory animus, and support the contention that Sharp held a good faith belief that Fisher had fraudulently reported unscheduled paid time off as covered by the FMLA.

Fisher makes much of the fact that she followed the correct procedure by reporting her FMLA-covered absences to Sedgwick while reporting personal illnesses to Sharp. However, this argument fails to consider that Sharp was under the impression that Fisher would only alert her of personal illnesses if she was taking unscheduled time off for her own medical issues and that Sharp was unaware of the fact that Fisher could use FMLA leave to tend to her own illness while caring for her mother. (*See* Pl.'s Closing Br., Dkt. 72, at 3). Fisher also insists that her text message on November 8 stating that she "didn't file for fmla days off since this is about me" referred to upcoming days, yet as Seton points out, the plain words of the message contradict this assertion given that Fisher phrased the sentence in the past tense. (Def.'s Closing Br., Dkt. 71, at 4–5). It was thus reasonable for Sharp to believe that Fisher was referring to November 3, 6 and 7 when she sent this message to Sharp.

While the standard for Seton to show that its decisionmakers had a good faith belief that their proffered reason for termination was correct is "not onerous," Fisher nonetheless insists that Sharp, Rojo and Cook were obligated to conduct further investigation into her case before terminating her. (Pl.'s Closing Br., Dkt. 72, at 5). Yet given that Sharp and the other decision makers

11

believed that the text messages clearly demonstrated Fisher's intent to use unscheduled paid time off to cover the days in question, they would not have thought it necessary to investigate further—especially in the absence of any credible evidence or further explanation from Fisher regarding the absences. Fisher had thus failed to show that Seton's decision makers acted unreasonably or in bad faith when they interpreted the discrepancy between Fisher's text messages to Sharp and her FMLA-reporting as fraudulent.

Although all of Seton's decisionmakers were ultimately wrong in assuming that Fisher had falsified her FMLA reporting, the credible evidence presented at trial revealed that the decision to terminate Fisher was "based on a good faith belief with no discriminatory influences," and as such, Seton's incorrect employment decision does not constitute retaliation in violation of the FMLA. *Jones v. Overnite Transp. Co.*, 212 F. App'x 268, 275 (5th Cir. 2006) ("An employer can make an incorrect employment decision; if based on a good faith belief with no discriminatory influences, then the court will not try the validity of the reason."); *see also Moore v. Eli Lilly & Co.*, 990 F.2d 812, 816 (5th Cir. 1993) ("The fact that the employers' reasonable belief eventually proves to have been incorrect . . . would not change the conclusion that the firing had been nondiscriminatory."). Accordingly, judgment must be entered in Seton's favor.

## IV. Conclusion

Based on the foregoing findings of fact and conclusions of law, the Court orders that judgment be entered in favor of Defendant Seton Family of Hospitals.

The Court will enter final judgment by separate order.

**SIGNED** on August 2, 2021.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE